The next case please. Case number 313-0277. In re Marriage of Darren Freihage, Appellee, by David Spurge. Marriage of Freihage, Appellant, by Michelle Chapman. Counsel. Good afternoon, your honors. Presiding Justice Schmidt, Justice O'Brien, Justice Wright, counsel. May it please the court. My name is Michelle Jochner, and I am here with my co-counsel, Donald Schiller, and we represent the appellant in this matter, Mary Freihage. We are grateful you have allowed us this opportunity to be here today and discuss with you the numerous errors made by the trial court in dissolving the party's 24-year marriage, which require reversal. The Illinois Marriage and Dissolution of Marriage Act is predicated on principles of equity and fairness. These concepts are woven throughout the statute, specifically in the mandate to allocate the marital estate in just proportions and to ensure equitable distributions. Accordingly, a critical step in this process is a trial court's valuation of the property prior to its apportionment. It is only where the valuation is supported by credible evidence that a fair and equitable distribution can occur. Valuation of the party's largest marital asset is one of the three issues we would like to focus on during our limited time with you this afternoon. The other two being the court's erroneous recognition of $550,000 of illusory marital debt being valid and enforceable, and its error in failing to grant Mary permanent maintenance in a proper amount. Although Mary raises additional challenges to the circuit court's judgment in her briefs, due to our limited time with you, we will focus on our discussion on these three issues in this order. But of course, we would be happy to answer any questions you may have on any of the other issues presented. Thank you for the invitation, because I'm going to jump right in. Wonderful. In the key of the judge's order, he values the franchises or the business at $10,600,000. I mean, these numbers are kind of beyond my personal standards. They are large. How did the judge reach that number? That is precisely the question that we have, Your Honor. So how can we review it? And because I think you even brought that to the trial court's attention, and the judge said, I don't remember. You're absolutely correct, Your Honor. The court repeatedly said that it did not remember, but there is evidence in the record to support a different valuation. And what the court will look at here is evaluation as a question of fact. And that question of fact is reviewed on the manifest way to the evidence standard. There was a dispute in the briefs between us and our opposing counsel as to what the standard of review was. And I think that Your Honors have answered that in a recent case, saying that the standard of review, and it was in re-marriage of Dillon, which was recently decided by this court, that valuation is a factual question subject to the manifest way to the evidence review. If a trial court selects a value... This number that was selected was not the number that either expert offered. Correct. I don't know, have either one of you been able to reproduce how that figure came about? That, we are not sure of how that came about. Our problem with the valuation is, again, that the record shows that it was an error of fact, and that it was against the manifest way to the evidence. In the trial court's ruling itself, the trial court found both experts to be well qualified. Unlike what opposing counsel said at pages 12 and 19 of their brief, the court did not find that Mary's expert, Mr. Cressman, lacked credibility. Not at all. He found that both of those experts were well qualified. In fact, Cressman is a certified valuation analyst who has done a lot of McDonald's work in the past. Mr. Fryhage's expert was a CPA without that extra experience. The court said it agreed with some factors from each expert, but it focused on two things. That it sided with Majita's valuation more so than with Cressman's valuation. The first was that the court found that the NFCA database is, quote, more reasonable as a benchmark for valuation purposes. There's no explanation in the record of why the court found this, and Mr. Majita himself was asked if there was authority for him to be using the NFCA database as opposed to Mr. Cressman's use. In fact, as we set forth in our brief, Mr. Majita did evaluation, did another evaluation with the opportunity reports, and came out about 3.5% more than Mr. Cressman. $3.5 million higher than what he came in with using the NFCA reports. And he himself said that the opportunity reports were valuable tools in valuation. There is no basis in the record for the court to have found that the NFCA database was a more reasonable benchmark for valuation purposes. Indeed, when Mr. Majita was cross-examined as to his use of the NFCA database, he admitted that the scores in his sample, quote, may not have been good comparables for those of the LLC. There were differences in location and product mix. He admitted that none of them may have even been in Illinois, unlike with the opportunity reports that Mr. Cressman used to normalize the figures. He chose not to compare the scores by reason or location, despite the fact that he knew that they may not have been good comparables for those of the LLC. He agreed that the McDonald's opportunity reports were reliable tools. There was no evidence of the time period of the data that he used in those reports. He failed to state the sales range for the NFC data he used. He admitted that it was a hit or miss approach because the scores in the LLC were not even included in that NFCA database because Darren's accountants are not part of the NFCA. The database, far from being more reasonable, was rather unreasonable to use. And I'd like to speak one moment about Mr. Majita himself. Mr. Majita was biased. And first and foremost, we can see that by the fact that there was no voluntary disclosure of his prior relationship with Darren. Mr. Majita was a partner in an accounting firm for 30 years with Lauren Bereson. Was the fact spread to the trial court's attention? Yes. Yes. This came out on cross-examination. Mr. Majita was asked, well, isn't it a fact that you were a partner with Lauren Bereson? The court made those credibility determinations based on allegations of bias. Well, but the court never found Mr. Majita to be more credible than Mr. Crespo. What lawyer ever hired an expert that wasn't biased for his client? Well, Your Honor, I think, though, that this was not disclosed. This was not disclosed. It came out on cross-examination that he had actually done work for Darren and did meet him in the past. That Darren was Bereson's client for seven years at his firm where Majita was there. And I also note that in their brief to this court, Darren's counsel fails to develop any argument to show how the testimony and evidence supported the trial court's judgment and refuted Mary's numerous claims of error regarding the use of the NFCA database. It is as if Darren has abandoned his own expert. He said not one thing about Mr. Majita and his valuation in his brief. Not one thing. Well, perhaps the one thing that he did say was in the statement of facts. There was one sentence in the statement of facts that appeared to support Mr. Majita. And, of course, that's argument that is not proper to be included in the statement of facts. What is the date evaluation that we used? The date evaluation... Was this a case of dated dissolution? The marriage was dissolved first and then the property value? No. No, this valuation took place first, Your Honor. The valuation date was at the end of 2011. The reports were filed in the summer of 2012. When was the marriage dissolved? 2013. All right. All right. That helps me. Yes, I believe... 20... 20... I'm sorry. There's so many dates. I know. Which is why we like to pick your brains, Your Honor. Absolutely. And sometimes... Yes, 2013. I was correct. February 1, 2013 was the date that the judgment of dissolution was entered. So, the valuation was done as of the end of 2011. The reports were filed in the middle of 2012. And then the dissolution was... The trial took place over 12 days in October and November of 2012. And then the court did not file an opinion until February 1, 2013, that is. Okay. So, I have a question about... I believe it was Majeed's evaluation. Yes. He did take into account the cost to rebuild an Oak Forest restaurant and a Timley Park restaurant. The Oak Forest rebuild, I know the numbers are in here, but that wasn't to occur until 2014. So, why is that relevant with regard to the value of the business in 2011? Well, Your Honor, it's relevant... I'm sorry. What date do we value the seven McDonald's franchises? Right. Do we use 11 or do we use 13? Well, that is a function of what happened here, is a function of the valuation of the method that both of the experts used here. Both of them used the income approach discounted cash flow method, which is the method of valuation which was used here by both experts. And it's a method that McDonald's recommends for valuations of their businesses. Okay. So, pick a date. What date controls? I'm sorry. What date controls? Well, it's a projection into the future, a future income, and then it's discounted to present value using an appropriate discount rate. So, it's a projection that's done... So, present value was measured in 2011 or on the date of dissolution in 2011? Here it was measured as of 2011. Why? That was the date that the trial court selected for that this was going to be the valuation date. Is that by agreement? That, unfortunately, Your Honor, I am not certain about that because we were not trial counsel in this case. So, I am not aware of how that came to be. So, what do you think happened to the value? Did it go up or down over the two years that this dissolution was pending? It's hard to say. We would think that based upon what was happening with the restaurants at the time and based upon Mr. Cressman's valuation, that they continue to increase. Actually, Mr. Vegeta said that because these are McDonald's restaurants, that McDonald's itself is the leader in the fast food industry and will continue to have growth which exceeds other franchise systems because of its brand recognition. So, by virtue of the fact that these are seven McDonald's restaurants that are part of a very well-known brand and that both experts agree that there would be continuing sales growth in the future as to this brand, we can assume that the values have increased. So, going back to my question, obviously the court picked the valuation date of December 31st of 2011. Why would the cost of rebuilding two restaurants in 2014 and 2013 be factored into that? My understanding is that it has to do with the valuation method that was used because you're projecting into the future and these would be future costs. Since you are talking about the reinvestments and the rebuilding of the restaurants, that was another thing. The trial court held that, quote, other factors which were unspecified, which were used by Vegeta, were also, quote, more reasonable. Again, no basis in the record for the court's ruling here. It is our position that Vegeta unreasonably increased future capital reinvestment expenses and the rebuild expenses, and we detail that in our brief. You will see that they were front-loaded expenses and that he also attributed excessive costs to all of these expenses to decrease the value at the time of valuation. For 2011 alone, he projected almost $800,000 as additional reinvestment to the already existing restaurants, and he based it upon a letter which was written to Darin in 2011 by Bill Mitchell, who was McDonald's Director of Chicago Operations, which summarized Darin's vision, quote, vision for what he wanted to do with the restaurants in, quote, the next several years. Not immediately. $800,000, that's in addition to the projections for the two restaurant rebuilds. These are like renovations and repairs that he's saying you can anticipate for this year even though they're not documented in a plan like those others. So that's why they haven't presented a basis. It's sort of just saying, and we think there's going to be $800,000. Absolutely. You have that correct, Your Honor. It was an additional $800,000 for those particular reinvestments on top of another $300,000 for improvements to Tinley 2, which were not included in Mr. Neal's document nor in the Mitchell letter, plus an additional $1.3 million difference for the rebuild, saying that Darin would take 100% financing and have everything be paid off in the first year, which is atypical, according to Mr. Creston. Usually it's a 50-50 split with McDonald's, and it's prorated over a period of 10 years. That alone was another $1.3 million devaluation. There was another, the fact that Mr. Magida used a 30% discount rate for the Tinley 1 store. That alone was $1 million. We have $1 million, $1.3 million, the other $800,000 that you pointed out. All of these assumptions were all incorrect, and they were borne out to be incorrect because Magida projected this $800,000 that we're talking about to be incurred by the end of December 31, 2011. It never happened. They never were incurred. He projected it to be, but they never happened, which shows that it's an unreliable report. It's not credible. And so that's why we believe that this court should reverse the judgment of the circuit court on the valuation issue, because the valuation, that impacts everything else. If this valuation is incorrect, that impacts the distribution of marital property, because then you have more marital property based upon what Mr. Magida, his valuation. Of course, there's going to be an increase in marital property. That needs to be redistributed. And then we have the issue of Mary's maintenance as well. I know that I'm running short on time, but I'd like to touch on that before I sit down, if I may, because that's very important. She is the perfect candidate for permanent maintenance, and she was given maintenance, which has a forced review in three years. Mary has no work skills. She has no experience. She has everything that all of the permanent maintenance recipients have in the cases where permanent maintenance has been given. And Mary was given rehabilitative maintenance with a review of three years, and the court also said that if she would not attain full employment by that time, that the court would then have to consider imputing income to her. All of the cases that we cite in our brief where permanent maintenance has been affirmed support our view that there was error here, that it was an abuse of discretion for the court to have non-permanent maintenance here. In lengthy marriages, Illinois courts give serious consideration to a permanent award of maintenance where the wife was a caregiver for the children. Here, Mary did that. She managed two households. She supported her husband's success. She lost and she impaired her employment skills during all of these years, and she's now not given maintenance, unlike the wife in In Re Marriage of Heroy who had a law degree, who had a publishing career. She was given permanent maintenance. In Re Marriage of Nord, the wife had $66,000 in potential income from properties, and she still was given permanent maintenance. In the In Re Marriage of Branken, the wife worked as a school teacher and earned $75,000 a year and still was given permanent maintenance. Darren's counsel in his brief does not respond to any of these cases, only says, well, they were affirmed because there was no abuse of discretion. The only one that he talks about is In Re Marriage of Selinger, and he says it's distinguishable because they're the maintenance who were terminated after two and a half years without the possibility of extension or review. And he states that was the only error. He ignores the language in this and other cases about permanent maintenance being proper where the spouse is not employable or only employable at a low income, which would result in a lifestyle deficit, and that's what Mary has here. After taxes, she has $11,000 a month to live on. After having a lifestyle where she and Darren enjoyed a lifestyle of $62,000 a month in spending, and he still lives that way, as is set forth in our brief. He still has exactly the same lifestyle. He has two homes that he spends $30,000 a month on to keep them. It's $360,000 a year on that alone. I know you wanted to touch upon the $550,000, but I have a question on that. The $550,000 allegedly was a debt owed to the exempt and non-exempt trust. To the residuary trust, and in our brief we lump them together as residuary trusts. But there were promissory notes documenting that debt? There were promissory notes. When was the $550,000 withdrawn or borrowed? Okay, there are three notes here. Let me just switch back to that quickly. Okay, there were three notes. Bear with me for one more. Thank you. Three notes. The first one, there was one on December 8, 1997, and that one was $350,000. Then there were two that were executed on the same day, March 27, 1998. One was for $173,000, and one was for $27,000. When did the promissory notes arise? When were they executed? Those are the dates that I just gave you. One was December 8, 1997, and then the other for March 27, 1997. So the promissory notes were timed with the loans. Is that correct? I was thinking they arose later in time. Which, I'm sorry, you were on the promissory notes. And so that's fine. There were documents issued in 1997 and 1998 documenting those withdrawals. Yes, there are promissory notes in the record, and I can reference them to you. It's PX24A, PX24B, and PX27A. So those are the three promissory notes. Again, no interest was required on any of those notes. No payments were made in more than 15 years. And there are demand notes where a demand has never been made. When those amounts came out, where were they applied to? Were they applied to non-business? This is debt that was, as I understand it from the record, it was debt that was used for the family's homes, or alleged debt. Our position is that this is illusory, that it's very similar to what happened in Johnson v. LaGrange bank, where it's a transfer that takes back all that it gives. These were never intended to be repaid. No demand has been made for these in 15 years. No payment has been made for them. And under the statute, under the section of the Code of Civil Procedure 13-206, and also under 3-118 of the UCC, both of them now are unenforceable. So you think that those debts should not have been subtracted from the value of the business? That's correct. And the court did not treat it as a marital debt, but it went into the business evaluation? No. It was treated as a marital debt. Right. We're not talking about the LLC debt at all. We did not raise that as an issue. We know that it was talked about below, but we did not raise that here. Did the trial court treat the DAF family trust as a marital asset? It did. It shows on the balance sheet that it was treated, but then there was a lot of confusion. It shows on the balance sheet in the briefs, but I don't know how the trial court treated it. Well, there was a lot of confusion about what the trial court meant to do with us. So what is your position? How the trial court treated the DAF family trust, which I understand Donna was putting in $10,000 to $13,000 per year, maximum gift allowed per person in that trust. That's correct. And the beneficiary of the trust was Darren only? For the DAF family, that stands for Darren A. Fryhage Family Trust. So it was Darren, it was Mary. They were named beneficiaries? They were two children. I believe that the way it worked, that she gave the highest amount of tax for gift to each one of those people every year. And then they could take it out if they wanted to within a certain amount of time, or it went back into the trust and it would stay in the trust. And did the trial court make it clear how it was treating it? It appears that what the trial court did is that it treated it as a marital asset because it took it out of the marital estate. But if you read the transcript on the motion for rehearing, on Mary's motion for rehearing, that transcript, everyone goes in circles about that DAF family. Okay, all right. It is just... Thank you for giving me your version of how the court treated it. Okay, thank you. Thank you very much, Your Honors. Okay. Mr. Kirsch? Can you start with the DAF family trust? I would be happy to. I'm sorry. I was very confused. I will, Your Honor. You've raised a number of points that I'm going to deviate from what I wanted to say and address some of these issues. I think I can clarify where the confusion is and some of the misstatements about the evidence. First of all, good afternoon. Thank you for taking your time today. My name is David Kirsch from Berger Schatz. I'll be having Darin Fry-Hagey. The DAF family trust, it stands for Donna Fry-Hagey, or maybe Darin, I don't know. But the DAF family trust was a vehicle established by... For Middle Initial A2? I think it is. Okay. If I remember right. I could be confused on that. But at any rate, someone told me it was Donna, but it doesn't really matter the name of the trust. The two trusts were established, one for Darin and his family and one for his brother Scott and his family. Okay. And that one's not on the radar. That one's not an issue. Not on the radar. The mother, Donna, Yes. made gifts to the trust. Yes. As you said, the maximum amount for each benefit. Yes. The beneficiaries are Darin, the three children, not two, three children, and originally married. Do you think it's a marital benefit? No. And I'll explain why, if I can. Under the terms of the trust, Mary ceased to be a beneficiary. Because she's not a spouse. Because she's a lone spouse. Right. So there's four beneficiaries. The only asset of the trust is this debt, these notes that Darin has signed to the DAF Family Trust for money that he borrowed from it. Otherwise there's no money in the trust? Right. It's all gone. It's not. The only asset is the notes. Correct. Oh. Okay. And what happened is, every year... Yep. I understand that part. You understand how the notes are written, the letters are written, the crummy notes, and so forth. Okay. Darin borrowed money, and again, this is all unrefuted testimony, and he paid down family debt or paid for family expenses with the $60,000 or so that he borrowed from the trust. Now, there is unquestionably marital debt. However, Darin is a beneficiary of the trust. Who else is a beneficiary? The three children. And why wasn't the spouse a beneficiary? Because... In terms of the trust, once she ceases to be a spouse, she's no longer a beneficiary. Because she was still a spouse. In terms of the trust, it actually says if she files for... Okay. Anyway, in terms of the trust, she was out when this marriage went south. And everybody agrees. Yeah, there wasn't any issue about that. So, Darin, as a beneficiary, is a beneficiary of one quarter of that $875,000 that is owed to the trust. Why is it a marital asset? It's not a marital asset. But, it struck us as... We didn't really... It struck us as extremely unfair to say that this is Darin's $250,000 or $225,000 asset, non-marital asset, but that there's an $800,000 marital debt. And to not offset that is inherently inequitable. So, if it's not a marital asset, then it's not a marital debt. No, it is a marital debt because the money went into the marriage and was used for marital expenses. That's undisputed. The debt exists as part of the marital debt because it was used for family purposes. What we did is offset that amount of debt, and what the court did is offset that amount of debt by Darin's interest in the trust. You know the court did that? Yes, if you look at the balance sheets, it sort of makes sense. That when there's $875,000 in debt, if you run the numbers per the court, run all the findings together with stipulations and so forth, the amount of the debt from the DAF family trust is offset by Darin's beneficial interest in the trust. In other words, Darin paying money to himself is foolishness. So it's basically what the judge did. If you run all the numbers, it comes out that he counted three-fourths of that debt as marital debt because it was unquestionably used for marital purposes to pay marital expenses down. Darin was an expert. But when it was expended, she was a spouse. She was a spouse because she received the benefit of it. So why does she have to pay that? She doesn't. He does. But it's part of the marital debt. The marriage borrowed the money. It's just like if you borrowed money from the bank. The bank is not a marital asset, but it's still a marital debt. Okay, the fact that it happens to be a trust doesn't really filter in, although I know it sounds like it should, but when you think about it objectively, it's a third non-party loaning money. The debt is still owed just as it would be to a bank or a GMAC or Target or someone. Okay. I also wanted to address the issue of the maintenance for a moment. Mary presented no evidence at all, no credible evidence at all, of her expenses for those of the minor child. If you read the transcript, she presented an affidavit, a disclosure statement, and when I asked her about it, how did you arrive at these figures for your expenses, she couldn't say. I pointed out to her, Ma'am, you signed this yesterday. Didn't you know 24 hours ago where those numbers came from? I don't know. As it turns out, later on, it turns out that what they did, what she did was took her expert, Kathy Vomonti Newman, went back through four or five years of family expenses, totaled them all up, divided them by the number of months they came out with an average for different categories, and Mary claimed 100% of those expenses for herself. She actually claimed that her expenses for she and one child exceeded the historic expenses for the entire family of five. All of the years that they used to calculate those expenses were based on five people living in the home, Darren, Mary, and all three children. Mary claimed 100%, more than 100% of those were her expenses for her and Austin. At one point, the judge held up her disclosure statement, cited it in her brief, and looked at counsel, and said, Counsel, what am I supposed to do with this? And he said, Am I not entitled to some statement of her income of her expenses and those of the child? And the attorney said, Well, that's it. And the judge said, It can't be. Obviously, her expenses for her and the child cannot be greater than the family of five. She presented no evidence of her needs. The only evidence of her needs was actually the temporary support order, which was in the amount of $8,500. The court went further than that, gave her that, plus another $7,000, and found it met all of her needs and luxuries. She had no evidence of her needs or the amount of childs, for that matter. She didn't put any in. Maintenance doesn't, in fact, if you read the, counsel seems, appellee seems to forget this. The judgment says, Mary is likely in need of permanent maintenance at another, at a lesser amount in the future. It says, she's likely in need of permanent maintenance. Maintenance doesn't terminate in three years. It says, if, it says, either party may petition the court to review the maintenance in three years. But if it's not reviewed, it keeps going. There's no end date on this. Darren would have to petition the court to terminate the maintenance for this to be terminated. There is no end. It is, in fact, a rule of permanent maintenance is not really permanent in the way most people use it. It is subject to modification or termination on certain events and in certain circumstances. So, maintenance is ongoing. It just can't be reviewed for three years. But if it's, if it's not reviewed, it's going to go before the court. It's going to continue at the exact same amount until someone does. The, the court asked about the methodology and both experts used the exact same method. McDonald's is, is, McDonald's are valued a little differently. Am I being silly to worry about the data valuation? No, and I'll explain why I don't think you should. The data valuation is selected in, and there's an order setting it. It was in a, a case management conference with the court, and I believe the order recites either pretrial conference or case management conference. I don't have it in front of me, but I was there. And in that case management conference, dates were set for discovery cutoffs, I believe, trial date was set, and a date was set for the valuation because in order to do a valuation, you can't really do it until March or April when you have the previous year's final numbers. So, the only issue if you get a, a, a, a valuation from December 2011 would be April or so, you get the numbers. Then it takes a couple months to do the valuation. You're now into the summer. The trial date was scheduled for November. So, that was the logical place to go. No one suggested, of 2012. No one suggested at the trial ever that these numbers were somehow not accurate or were skewed because of the passage of time. You hadn't even had a full year since the valuation date. It was as recent as is practicable under these circumstances given the lag of time in generating the necessary financial documents to produce the report. So, they were numbers from 2010 though because you said that you don't value until March or April. So, if, if they used, I mean, it was my understanding that it was the financial date was 2011. I mean, that's just the, that's the end of the information gathering was the year ending 12-31-2011. Information was processed then in March of 12- Right. That's, the data, the data stops end of December but in the process of compiling, as you all know, compiling final financial sheets and everything else, it takes a few months for the accountants to do it and so, in order to have a trial, the trial may have even been earlier, originally in July or something, but I think it was, anyway, it was ultimately in November. I'm good. Go ahead. Let me ask you this. Did anybody down below argue this on the value of the date? No. It was agreed to at the pre-trial. The, the standard of review, Your Honor, is abuse of discretion. The counsel says we didn't address their points. We're not required to in this sense. We're not required, it's not like a complaint where you have to admit or deny each factual allegation. The, we addressed every issue in our brief. She can't point to one issue we didn't address. We didn't address each mischaracterization of the evidence because we would have spent three-fourths of the brief doing that. The appellee's task in this situation is to show the court that there is credible evidence in the trial court record to support the court's judgment and there is. You have to remember that Marion Prager was given 100% of the value of the estate. She got almost all in cash. 100% of the value of the estate. Darren got that and he included the debt that was incurred to pay Marion's attorneys fees on his own which was over $600,000. He was, he had paid from, they had incurred debt to pay her fees of over $370,000 at the time of the judgment and Darren was ordered to pay that debt. So Darren was paying her fees no matter what they raised and he said here, he's paying it. The court said no, you've got to pay the rest. The issue of how the valuation was reached is unknown. I can speculate that Judge Berry may have ... He didn't speculate. No, he did. No, he said I can't tell you how I got it. Right, I don't know how he did it. Obviously, he looked at some things and he said I saw things I liked from each one and he put them together and came up with this number but the point is that under the law, under Inmate Marriage of Olson, a valuation of an asset that falls between the two ... that  Pressman's valuation was too low and that Mr. Pressman's was way too high and with good reason. Mr. Pressman was not credible for a number of reasons that we pointed out. Number one, they questioned his credentials. He's had three years in this business. He has been asked by McDonald's Corporation to give speeches to its executives and owners. McDonald's recognizes him  expert. By contrast, he doesn't have the alphabets under his name. He belongs to an earlier generation. By contrast, Mr. Pressman has abandoned this notion that this business debt to the trust was not debt. This is a fabricated thing by Mr. Pressman which in and of itself destroys his credibility on every point. The business debt is $5.5 billion. That is what Mr. Pressman said doesn't exist despite McDonald's recognizing it, Chase Bank recognizing it. He's never missed an interest payment but he said it doesn't exist. That in and of itself taints his   credibility. He admitted there was no risk and he was willing to use a 20% number. That value should have been lower. He admitted that his own papers called Business World which is a source document said that on a  basis there was a 2% annual growth rate. He admitted that but he used 3% which creates a higher cash flow and a higher value. The thing with the rebuilds is Darren has always done it. You have the option of McDonald's financing half and you finance half. You pay a higher share of your sales. Darren elected the other. Even though that was his history for seven stores he assumed he wouldn't do that. Why is this important? Because it creates less debt. He refused to get the information from McDonald's as to the actual cost. McDonald's had it. It's in our exhibits. It shows how much he spent  rebuild the stores. $4.8 million. Not the $2.8 million. That's going to decrease the value of the stores. Ultimately Darren believes building better stores creates better customer goodwill. He knows how to run his stores. The opportunity reports are a joke. McDonald's representative said they are not intended to be used for valuation. We never use them for valuation. On the face they have these disclaimers that say this may not apply to your store. The opportunity reports do not contain sales volume. Also, the NCFA documents are created by nine accounting firms which do accounting for 3200 McDonald's including Mr. Pressman's firm. Mr. Pressman said that those databases were compiled so that these member firms could have comparable numbers, could have these for valuation. Yet, Mr. Pressman did not use the database that his own firm maintains. Why? Because it gave a lower number, a more accurate number. It is nonsensical to think that his firm would create this database if they already had these other things that they could use for McDonald's called opportunity reports. They created it with these other firms because it was necessary to create honest valuations and have honest comparables. The number of comparables, the number of comparisons that Mr. Pressman did, the wider spectrum, it contains sales volume which is key. If you look at this local area, you've got stores in Oakbrook, stores in Tinley Park, you've got stores up in Lake Forest, you've got stores in downtown Chicago, you've got stores at two airports, you've got such a huge variety that to say that there's going to be some similarity between the local stores that you won't get if you use a national survey is insane. We showed the real estate taxes on these stores, a little different by over 50%. And these are all local. So if you're going to say that the O'Hare store is the same as the Tinley Park store, that's crazy. It can't be. It just can't be. It doesn't have a parking lot and so forth. It doesn't have a play area. Finally, the gist of this whole thing is that Cressman used inappropriate data. He didn't bother to get the right data from McDonald's. He used a sales bump post rebuild of 15%. If you look at the record, the McDonald's documents and evidence, 10%. That's what they say. Also, your Honor asked about the reinvestment. The way McDonald's are valued is unlike most things. Most things, you take a stream of income, you make adjustments because the guy is running his car through the business or cell phone, and you make adjustments to the income and you do a present value with a discount rate that's what you do. If there is impending reinvestment work, they deduct that also. No one said this investment work wasn't going to be done. There was no testimony about that. Just as there was no testimony about how Darren is living today. Thank you. Ms. Jackner, some rebuttal. We've given you both some leeway here. The first round we're going to hold you to your time on this. Of course, your honors. Thank you for your indulgence and the time. We do really appreciate it. Just a couple of things. Our brief sets forth in detail what they did not respond to. I won't go back over that. Suffice it to say that Darren did not dispute that any of the facts we presented were not accurate. This is a manifest way to the evidence standard. We contend that here the trial court erred in its factual findings regarding evaluations and that there was a manifest way to the evidence standard. Counsel spends a lot of time on the debt to the LLC. It's funny that he does that in his brief. We note that that's not what we're appealing. It has nothing to do with this appeal. He says it's all about debt and that's not the case. He's trying to redirect the focus of this court to try to confuse it with the LLC debt. We're not appealing that. Cressman though, since he did bring it up, treated the LLC debt the way he did because that's the way independent third parties treated that LLC debt. He relied on documents prepared by Chase and reflected statements made by McDonald's personnel that this was not debt, it was equity. And there was testimony at trial that said that he had a very unique situation and that they were comforted by the facts that they knew about the trust. And I won't say anything more about that. There are no credibility databases that the court found to be more reasonable and we have disputed that. And also those unspecified other factors that we don't know what the court meant, but we have shown over and over again how those factors are unreasonable. Mr. Magida was not an independent expert. He already had a personal and pre-existing relationship with Darren, which was not disclosed. The proof that his valuations were not reliable is because they didn't occur. Justice O'Brien, you asked about the 800,000 and potential rebuilds that were supposed to take place at the end of 2011. They never happened. That alone, we know, that's in the record. He projected those to happen and they never happened. That was almost a million dollars right there which devalued the LLCs. Opposing counsel talks about what Darren does and how different it is. That is not meant to play into the definition of what a fair market value is. Both experts use Revenue Ruling 5960, which defines fair market value as what a willing buyer and a willing seller would do in an open market. Manjita himself said the Opportunity Reports were valuable tools. The NFCA database, Darren's stores are not in the database itself. So is it reliable? It's hit or miss. Darren's own stores aren't in that database. The Death Family Trust, Justice Wright, you asked about that. I think the conversation here shows what we tried to show in our briefs. There was so much uncertainty about the calculation and what happened with that that it just cries out for reversal and recalculation. Mary's expenses, Mary was only out of the house for two months by the time she was at trial. She was living in the guest apartment over the garage. Darren was in the big house. She lived in the little apartment over the garage until two months prior to trial. She stated outright that she was using Cathy Beaumont Newman's report. Darren didn't put any evidence in. His testimony was unanimous and she did the best she could. Your honors, we appreciate you considering this case and allowing us to talk to you today and we've talked about all of the things that we believe are injustices to Mary and in some affirming the trial court here on this record and based upon what you know and what you've seen is the equivalent of affixing a stamp of approval upon inequity and unfairness to Mary. We ask that you correct the numerous errors of the circuit court and that you reverse its judgment and allow her to have fairness. Thank you, counsel. Both of you for your arguments here this afternoon. The matter will be taken under advisement. A written disposition will be issued. We'll be on a brief recess about panel discussion on  case. Thank